Rene L. Valladares
Federal Public Defender
Nevada State Bar No. 11479
*Shelly Richter
Assistant Federal Public Defender
California State Bar No. 343104
411 E. Bonneville Ave., Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Shelly_Richter@fd.org


*Attorney for Petitioner Nestor Quintana

# United States District Court
## District of Nevada

| | |
|---|---|
| Nestor Quintana, | |
| Petitioner, | Case No. 2:22-cv-00947-MMD-NJK |
| v. | **First Amended Protective Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254** |
| Calvin Johnson, et al., | |
| Respondents. | |

### Introduction

This case began when Mr. Quintana filed a pro se petition for a writ of habeas corpus with this Court on or about June 10, 2022. ECF No. 1-1 at 15. On July 27, 2022, this Court appointed the Federal Public Defender, District of Nevada, to represent Mr. Quintana. ECF No. 6 at 2. On September 6, 2022, this Court ordered Mr. Quintana to file an amended petition within 60 days if necessary. ECF No. 10 at 1.

Mr. Quintana has tentatively calculated the federal statute of limitations under 28 U.S.C. § 2244(d), and the limitations period has not expired. Further, Mr. Quintana filed a petition for writ of habeas corpus (post-conviction) in state court on August 5, 2022, and he is entitled to statutory tolling while that properly filed petition is pending. The purpose of this first amended protective petition is to ensure that all the possible claims counsel has identified so far are timely preserved for federal review. *See Mayle v. Felix*, 545 U.S. 644, 650 (2005).

This first amended protective petition specifically incorporates by reference all the claims, arguments, and exhibits associated with Mr. Quintana's pro se federal petition. ECF Nos. 1-1, 7. The claims presented in this first amended protective petition are intended to be considered in addition to the claims presented in the prior pro se petition. In other words, this first amended protective petition should not be construed to abandon any claims in Mr. Quintana's pro se petition.

Likewise, counsel is filing along with this first amended protective petition a set of exhibits comprising critical parts of the state court record. Mr. Quintana respectfully incorporates the contents of those exhibits by reference here. To be clear, Mr. Quintana intends to raise in this first amended protective petition any and all claims for relief he has previously raised in state court.

PROCEDURAL HISTORY

**A.    State court trial and direct appeal proceedings**

On March 29, 2017, Nestor Quintana was charged with five counts of lewdness with a child under the age of fourteen, and four counts of sexual assault with a minor under fourteen years of age. Petitioner's Exhibit ("PEx.") 1.

Quintana's jury trial occurred in December 2019. The jury convicted Quintana of Counts 1 and 2, lewdness with a child under the age of 14. PEx. 2. Quintana was sentenced to two consecutive terms of life with a minimum parole eligibility of ten years. *Id.* The judgment was filed on February 3, 2020. *Id.*

On direct appeal Quintana raised the following claims:

(1) The district court violated Quintana's constitutional right to confront his accuser;

(2) The district court violated Quintana's Due Process right to a fair trial by admitting prejudicial bad act evidence;

(3) The State violated Quintana's fundamental right to a fair trial by committing prosecutorial misconduct;

(4) The district court erred in rejecting Quintana's proffered jury instruction;

(5) Cumulative error warrants reversal.

**B.    State post-conviction proceedings**

On August 5, 2022, Quintana filed a pro se petition for writ of habeas corpus (post-conviction) in state court. PEx. 12. He raised the following claims:

(1) Mr. Quintana's trial attorney provided ineffective assistance before and during trial and sentencing, violating Mr. Quintana's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as under Article 1, Section 8, of the Nevada Constitution;

(2) Mr. Quintana's direct appeal attorney provided ineffective assistance, violating Mr. Quintana's rights under the Fifth, Sixth, and Fourteenth

3

Amendments to the United States Constitution, as well as under Article 1, Section 8, of the Nevada Constitution;

(3) The prosecution withheld exculpatory information and/or knowingly failed to correct false testimony, violating Mr. Quintana's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as under Article 1, Section 8, of the Nevada Constitution.

That petition has not yet been resolved.

### STATEMENT REGARDING 28 U.S.C. § 2254(D)

With respect to each claim in this petition, Mr. Quintana alleges any rulings from the Nevada appellate courts denying him relief on the merits are (or would be) (1) contrary to, and/or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and/or (2) are (or would be) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Mr. Quintana also asserts for the purposes of further review that the standard of review in 28 U.S.C. § 2254(d) violates the U.S. Constitution, specifically the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of Due Process (Amendments Five and Fourteen). *But see Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007) (rejecting some of these arguments).

### CLAIMS FOR RELIEF

## I.    Direct Appeal Claims

### A.    Statement of Facts

MG is Quintana's stepdaughter. At all relevant times MG lived with her mother Melissa Quintana ("Melissa"), her sister MQ, her maternal great-grandparents David ("David") and Louise ("Louise") Tones, and Appellant at the

family home in North Las Vegas, Nevada.[1] MG never met her biological father. AA VIII 1809-10.

Melissa was a stay-at-home mother prior to the events which give rise to the allegations against Quintana. *Id.* at 1807. Quintana honorably served in the United States' Military during the Iraqi war. AA IX 1938. The Military discharged Quintana due to psychological issues related to his combat service. *Id.* After his discharge, Quintana was considered 100% disabled due to combat induced post-traumatic stress disorder ("PTSD"). *Id.* at 1934. Quintana was 30% disabled due to migraine headaches, 20% disabled due to vertebral cervical spine disc syndrome, and 10% disabled from post right CMC radio collateral ligament laxity and sprain. *Id.*

In February 2017, MG was 11 years old. AA VIII 1617. MG was a good student at school. *Id.* at 1948. However, MG had difficulty making friends and experienced bullying from her classmates. *Id.* Every Thursday MG went to the nurse's office complaining she felt ill and requesting she be allowed to go home. *Id.*

Around this time Melissa and Quintana noticed MG began lying, hiding things, and being secretive.[2] *Id.* at 1835. Earlier in 2017, MG created a profile on the Musical.ly social media application.[3] *Id.* at 1943. In her Musical.ly profile MG stated, "I hate my birth parents because they left me. I hate everyone. I serve for

---

[1]After Quintana's arrest, Melissa gave birth to a son, NQ. AA VIII 1621, 1625.

[2]By February 2017, Melissa believed that MG was generally not a truthful person. AA IX 1947.

[3]Musical.ly was the precursor to TikTok, a Chinese social media application which allowed users to create and share brief music videos with other users. *See* Biz, Carson, "How a failed education startup turned into Musical.ly, the most popular app you've probably never heard of," available at <https://www.businessinsider.com/what-ismusically-2016-5>, last accessed September 14, 2020.

money. I hate my foster home. I hate my friends because they bully me. I hate my life. Don't waste your time." *Id.* MG was not and had never been in foster care. *Id.* MG also posted a video clip where she stated, "hey, guys, I just want to say my bio is true ever since my parents passed, but don't worry; I'm fine. I'm probably going back to the foster place tomorrow." *Id.* at 1944. MG posted other videos where she claimed she did not have food to eat or shoes and clothing to wear. *Id.* at 1944-45. In response, persons following MG on Musical.ly dropped off food, clothing, and shoes at Quintana's house. *Id.* at 1945.

When Melissa and Quintana discovered MG's Musical.ly app they punished MG by taking away all devices and cutting MG off from social media. *Id.* To circumvent this punishment, MG's friend "Treyveon" created new social media accounts for MG. *Id.* When Melissa and Quintana learned about these clandestine social media accounts, they redoubled their efforts to keep MG off social media. *Id.* Nevertheless, MG was able to create a Youtube.com account where she uploaded videos. *Id.* After discovering the Youtube.com account on February 8, 2017, Melissa and Quintana threatened to take away MG's Xbox video game console. *Id.* at 1946.

The next day MG went to the nurse's office at school complaining she felt ill. *Id.* at 2007. First Aid Safety Assistant Maryhelen Lopez ("Lopez") believed MG was fine and sent MG back to class. *Id.* Later that afternoon MG returned advising she vomited and had an earache. *Id.* at 2010. Lopez took MG's temperature but did not notice a fever. *Id.* MG started to cry so Lopez advised MG could confide in her, especially if there were problems at home. *Id.* Lopez then left MG alone to rest. *Id.*

Shortly thereafter MG approached Lopez requesting to speak in private. *Id.* at 2011. Lopez took MG into the bathroom. *Id.* In the bathroom MG told Lopez that Quintana had been touching her "privates." *Id.* MG further advised that Quintana told her not to tell anyone or else "they were going to take [MG] away from [her]

6

mother[.]"[4] *Id.* at 2012. Lopez began to cry, comforted MG, and accompanied MG back to the nurse's office. *Id.* Lopez then reported MG's allegations to the principal. *Id.*

Christina Simms ("Simms")—the "Safe School Professional"—met with MG while awaiting police arrival. *Id.* at 2031. Simms questioned MG regarding the allegations. *Id.* at 2034. In response to Simms' questions, MG vaguely asserted Quintana had been "doing things" to her beginning around the time her sister MQ was born, which was when MG was approximately six or seven years old. *Id.* When Simms pressed MG regarding specifics, MG only offered vague details concerning certain incidents and only offered one specific incident where Quintana allegedly touched her inappropriately. *Id.* at 2035. MG did not cry when she spoke with Simms. *Id.*

Eventually North Las Vegas Detective Jorge Correa ("Correa") arrived to investigate. AA X 2274. Upon arrival Correa learned that MG had disclosed "her stepfather, Nestor Quintana, had been touching her private parts, and also he had tried to put his penis in her vagina for—several years." AA X 2275. Correa decided to interview MG. MG first told Correa she enjoys watching *Criminal Minds* and *Law and Order* on Netflix because both these television programs "teach her who to look out for." *Id.* at 2301. MG then explained earlier that day she went to Lopez because she felt nauseous. *Id.* at 2303. However, Lopez sent her back to class. *Id.* After she returned to class, MG claimed she passed out. *Id.* MG did not remember passing out but rather Trayveon told her she had passed out. *Id.* at 2304. MG further explained she did not remember going back to the nurse's office or the fact she passed out again once there. *Id.* at 2305. MG told Correa that this was the first

---

[4]At trial MG acknowledged that she told Lopez that Quintana had touched her but did not remember saying anything else. AA VIII 1631-32.

time she ever passed out and did so because he was scared and nervous regarding her upcoming tetherball competition. *Id.* at 2306-07.

According to Correa's trial testimony, MG told Correa she does not like when Quintana takes her into his bedroom and "touches her." AA IX 2281. When Correa pressed MG on this allegation MG described an alleged incident where she was getting ready for school and Quintana told her to come into his bedroom. *Id.* After MG complied Quintana went to the bathroom. *Id.* Quintana then exited the bathroom yelling at MG in a language she did not understand. *Id.* Quintana then removed MG's clothing, told her to get into the bed, and went back into the bathroom. *Id.* Besides claiming he removed MG's clothes, MG did not claim Quintana touched her inappropriately during this alleged incident.

MG also described an incident where Quintana threw her on the floor, grabbed her hand, and placed her hand on his penis. *Id.* at 2282. MG alleged another incident where Quintana allegedly entered MG's room, took her into his bedroom, took her clothes off, and "tried to kiss her and put his tongue in her mouth. *Id.* Finally, MG alleged an incident where Quintana grabbed her breast and then ran into the bathroom. *Id.* Although MG claimed the first incident occurred when she was "probably five or six," she could not provide any dates for any of the other alleged incidents except the "last incident" occurred "a week prior to us responding to the school."[5] *Id.* at 2283.

According to Correa's police report[6] the alleged incidents involving Quintana typically occurred after Melissa left for work, usually on school days. AA VIII 1647.

---

[5]MG testified at trial that she remembered speaking with Correa and telling Correa that Quintana had molested her, but she did not remember making any specific allegations. AA VIII 1638-40.

[6]At trial MG either denied Quintana touched her inappropriately or testified she did not remember telling Correa that Quintana touched her. Therefore, the State used Correa's report and/or preliminary hearing testimony to impeach MG.

Additionally, generally during each alleged incident Quintana would remove MG's clothing and touch her private areas.[7] *Id.* at 1648. However, when pressed on specific details regarding the alleged incidents, MG offered vague details or did not actually allege that Quintana committed either a lewd act or a sexual assault.

For example, MG disclosed an alleged incident that occurred when she was six years old. During that incident MG was playing video games and heard her sister MQ crying. *Id.* at 1656. When MG went to check on MQ, Quintana interrupted her and told her to go to her room. *Id.* Quintana was supposedly wearing a white t-shirt and boxer shorts. *Id.* at 1657. MG did not allege Quintana touched her inappropriately during this incident.

Additionally, MG disclosed that sometime during 2016, she was in the shower when Quintana entered the bathroom and forcibly removed MG from the shower before throwing MG on the bed and telling her to wait there. *Id.* at 1658. Meanwhile, Melissa returned home so Quintana told MG to "hurry up, get dressed, get out of here." *Id.* at 1659. When Melissa asked MG why was wet, MG told her she had slipped in the shower. *Id.* Again, MG did not allege Quintana touched her sexually during this incident.

MG also mentioned an alleged incident where, after Melissa had left for work, Quintana grabbed her by the arm. *Id.* at 1666. MG fought back, but eventually passed out. *Id.* at 1667. When MG awoke, she was in her bedroom.[8] *Id.* MG did not allege Quintana touched her sexually during this incident.

---

[7]MG testified at trial that she did not remember telling Correa that Quintana had ever touched her breasts. AA VIII 1664. Additionally, although MG vaguely remembered alleging that Quintana made MG touch his penis, she did not remember the specific allegations she supposedly told Correa. *Id.* at 1660. Finally, MG testified that she did not remember ever telling Correa that Quintana grabbed MG's hand and made MG touch his penis. *Id.*

[8]At trial MG testified this incident did not happen. *Id.* at 1667.

Finally, the final alleged incident occurred either a week or a month before her disclosure, around 5 a.m., after Melissa left for work. *Id.* at 1652. As MG prepared to take a shower and was "about to take the dogs out," Quintana allegedly told MG to ignore the dogs, turn off the shower, and "get in here." *Id.* MG allegedly explained to Correa, "I already knew what was going to happen, so I turned off the water and all the lights, and then [] turned off [the] phone . . . I turned off the music on my phone, and [] went to make sure [MQ] was already getting ready for school." *Id.* MG entered the bedroom and Quintana either took MG's clothing off or had MG remove her clothing. *Id.* Quintana briefly entered the bathroom before returning to the bedroom. *Id.* MG advised she did not recall what happened. *Id.* at 1654. MG only remembered being in the shower with only enough time to wash her hair. *Id.*

Later MG changed her story and claimed this incident occurred at two separate times that same morning. *Id.* at 1668. MG claimed around 5 a.m. Quintana entered MG's bedroom, grabbed her by the arm, threw her on the bed, and told her not to move. *Id.* Quintana then allegedly choked MG. *Id.* at 1669. Around 7 a.m., Quintana allegedly grabbed MG and pulled her into his bedroom. *Id.* at 1671. MG alleged Quintana was naked and kissed MG on the mouth while she fought back. *Id.* Quintana then allegedly entered the bathroom while MG exited the bedroom. *Id.* at 1672.

As MG spoke with Correa Melissa and Quintana arrived at the school. Upon arrival officers advised Melissa and Quintana would have to wait in administrative office. AA IX 1815. Concerned, Melissa contacted David and Louise who drove to the school. *Id.* at 1817.

Officers eventually separated Melissa and Quintana and escorted Melissa into a room where MG was located. *Id.* at 1821. When Melissa entered the room, she noticed MG was smiling and texting her friends. *Id.* at 1823-24. Officers explained MG's basic allegations while in MG's presence. *Id.* at 1827. Upon hearing the

allegations, Melissa became confused explaining she believed the allegations were false. *Id.* Officers then separated Melissa and MG. *Id.* at 1828. During questioning, Melissa explained Quintana was almost never alone with MG. *Id.* at 1841. Melissa also explained Quintana had various health issues. AA X 2248. Finally, Melissa explained that MG had recently engaged in dishonest behavior. *Id.* at 2293.

After Melissa's interview Correa explained he would contact Quintana to schedule an interview. AA X 2286. Correa told Quintana about MG's basic allegation that Quintana grabbed MG's breasts and made MG touch his penis. *Id.* Quintana denied this allegation. *Id.* Correa advised that MG made numerous inconsistent statements during her interview. AA XI 2344. Nevertheless, Quintana could not have any contact with his children until Correa completed his investigation. AA X 2287. Quintana left the school and went home to gather personal belongings while Melissa and the others remained at the school. AA IX 1853.

The next day Correa contacted Quintana to schedule an interview. AA X 2288. Quintana advised he had nowhere to stay and would be living in his car until Correa completed his investigation. *Id.* Correa decided to expedite the interview. *Id.* at 2289. Correa enlisted FBI Special Agent Gary McCamey ("McCamey") to assist with the interview and to conduct a polygraph examination.[9] *Id.* at 2233-24. Correa told McCamey that MG had alleged Quintana rubbed MG's breasts and forced MG to grab Quintana's penis and Quintana had denied the allegations. *Id.* at 2235-36. Correa did not advise McCamey regarding any other allegations.

Melissa scheduled Quintana's interview with McCamey for February 15, 2017. AA IX 1900. That day Melissa drove Quintana to the FBI office and arrived

---

[9]Upon Quintana's motion prior to trial, the district court prohibited any mention or inference to the polygraph exam at trial. AA V 971.

around 10:30 a.m. *Id.* at 1901. Melissa waited in the car as Quintana went inside. *Id.*

Initially, McCamey made small talk with Quintana.[10] AA X 2238. McCamey then discussed Quintana's right against self-incrimination and Quintana agreed to waive that right. *Id.* McCamey conducted an intake interview to ascertain Quintana's background information. *Id.* at 2242. McCamey asked whether Quintana understood the purpose of the interview and Quintana acknowledged MG accused him of sexual molestation, but advised her allegations were false. *Id.* at 2242-43. Quintana explained the medication he takes for PTSD causes gynecomastia. *Id.* at 2243. On one occasion MG grabbed and pinched Quintana's enlarged breasts. *Id.* Quintana did the same to MG. *Id.* Quintana acknowledged what he did was inappropriate, but denied his actions were "sexual in any way, shape, or form." *Id.* McCamey then explained—based upon his conversation with Correa—that MG had alleged Quintana forced her to touch Quintana's penis. *Id.* Quintana denied this allegation. *Id.* Quintana explained he and Melissa had decided to homeschool MG and MG manufactured the allegation against him in response. *Id.* at 2244. McCamey told Quintana that if he did molest MG, and did not admit to doing so, then Quintana would effectively re-victimize MG by branding her a liar. *Id.* at 2260. McCamey also told Quintana, "there might be an explanation for why this happened." *Id.* McCamey then conducted the polygraph. *Id.* at 2244.

After two tests, McCamey advised he believed Quintana's answers were deceptive. *Id.* Thereafter, McCamey conducted a detailed, unrecorded, interview with Quintana. *Id.* at 2244. Without a recording to ascertain what methods McCamey employed during this interview, McCamey nevertheless claimed

---

[10]McCamey chose not to audio or video record his pre-interview, the polygraph examination, or the post-polygraph interview. AA X 2234.

Quintana confessed during the interview.[11] *Id.* McCamey claims Quintana admitted that once around midnight or 4:00 a.m., Quintana awoke with an erection. *Id.* Thinking Melissa was next to him, Quintana grabbed the person's hand, placed it on his penis, and began moving the hand up and down. *Id.* at 2245. Simultaneously, Quintana placed his hand underneath the person's shirt and began rubbing the person's breasts. *Id.* Quintana acknowledged he quickly realized it was not Melissa but was instead MG. *Id.* Nevertheless, Quintana allegedly continued and moved his hand down underneath MG's shorts and rubbed her vagina. *Id.* Quintana continued to do this for three to four minutes until he felt ready to ejaculate. *Id.* At that point Quintana allegedly got out of bed, went into the bathroom, and masturbated. *Id.* According to McCamey, Quintana advised he felt bad about what happened but also "felt excited." *Id.* at 2246.

McCamey asked Quintana to write a statement "in his own words."[12] *Id.* at 2247. Quintana agreed and wrote the following:

> I'm truly very sorry for what went on that day. I was sleeping on my bed in my room when I woke up feeling someone next to me. Thinking it was my wife, I hugged her and she got closer. I grabbed her hand and put it on my erection. I reached around and felt on her breast down to her private parts. All along I thought it was my wife and there was no way to know until I was about to finish. That is when I got up and saw that my wife wasn't there, and it was my stepdaughter MG laying there. I felt so bad and felt confused, and after I come back to my bed, she was gone. It only happened once and I've been feeling bad ever since. I am truly sorry for my actions and know that I've—know that it hasn't and won't occur again. Nestor Quintana, 2/15/2017.

AA X 2249.

---

[11]The interview lasted between 45 minutes to an hour. AA X 2250.

[12]The State admitted Quintana's hand-written statement at trial as State's exhibit 3. AA X 2248.

After Quintana provided  this statement, McCamey called Correa to the FBI office to interview Quintana. *Id.* at 2251. Correa responded to the FBI office. *Id.* at 2296. Correa conducted a tape interview with Quintana.[13] After completing the interview, Correa placed Quintana under arrest. *Id.* at 2296. While accompanying Quintana to his police vehicle, Correa noticed Melissa in the parking lot. *Id.* Correa explained to Melissa that Quintana had "confessed." *Id.* at 2296-97.

On February 16, 2017, Melissa took MG to see Dr. Dennis Moore ("Moore") at Southwest Medical Associates. *Id.* at 2188. According to Moore, MG generally advised that Quintana had been touching her starting when she was around five or six years old. *Id.* at 2193. This alleged molestation occurred almost daily until the last incident in November 2016. *Id.* at 2194. Although MG claimed most incidents involved Quintana touching her breasts and genitals, MG also claimed Quintana penetrated her vagina with his penis on three occasions, the most recent being November 2016.[14] *Id.* at 2195. Melissa told Moore that MG's allegations were different than the allegations MG made to Correa. *Id.* at 2198. Melissa asked Moore whether MG should undergo a sexual assault exam. Moore explained he could only do so upon law enforcement request. AA IX 1928.

On March 14, 2017, DFS caseworker Allison Cannon ("Cannon") met Melissa to discuss a family safety plan. AA X 2075. Melissa informed Cannon that MG had recanted her allegations to a family friend. *Id.* MG also told Cannon that shortly after her disclosure on February 9th, MG recanted her allegations to her friend Jessica. AA VIII 1695

---

[13]The State admitted Correa's taped interview with Quintana at trial as State's exhibit 1. AA X 2296.

[14]At trial MG testified she did not remember telling Moore that Quintana penetrated her with his penis three times. AA VIII 1681.

In April 2017, MG began therapy with Kimberly Molnar, a licensed marriage, family, and substance abuse counselor. AA IX 1986. During MG's last session with Molnar in June 2017, MG explained that Quintana had not abused her and that her prior allegations were false. *Id.* at 1990.

In September 2017, Melissa contacted another CPS caseworker, Kalena Edwards ("Edwards") advising that MG had recanted her allegations against Quintana. AA X 2101.

As the months progressed MG experienced mental health issues. AA IX 1909. In October 2017, MG indicated she desired to harm herself and therefore, Melissa admitted MG to Seven Hills Hospital. *Id.* Melissa called CPS caseworker Edwards explaining MG was suicidal due to the CPS involvement in her life. AA X 2108. While at Seven Hills, MG informed Dr. Sunresh Bushan that MG felt guilty and shameful because she falsely accused Quintana of molesting her. AA XII 2617. Additionally, MG told Emma Compran, that she falsely accused Quintana and felt guilty. AA VIII 1745-46.

Around this time Melissa re-enrolled MG in public school. AA IX 1911. One day at school MG threatened to "shoot up the school and hang herself in the bathroom." *Id.* at 1910. Melissa tried to have MG admitted to Seven Hills again, but was told to take MG to Monte Vista Hospital. *Id.* at 1911.

On November 17, 2017, during a counseling session at Heads-Up Counseling, MG informed physician's assistant Joan Carapucci that she "made up a story about being raped by her stepfather." AA XII 2617. Similarly, during a therapy session with Ngozi Ugwu at Desert Behavioral Center MG explained she falsely accused Quintana of sexual abuse. AA VIII 1748.

At trial MG explained she made the false allegations against Quintana because she was angry. *Id.* at 1632. Specifically, MG became upset when she learned that her biological father desired a DNA test and because Quintana and

Melissa took MG's Xbox and other devices taken away. *Id.* at 1632-33. Additionally, MG testified she was jealous because Melissa was pregnant with NQ. *Id.* at 1633. MG further testified CPS workers told her what to say and she agreed to repeat their allegations. *Id.* at 1673. Additionally, MG testified Cannon threatened to remove MG from Melissa's care if MG did not repeat her claim that Quintana molested her. *Id.* at 1685-86. MG also testified she recanted her allegations almost immediately to Melissa, Louise, and Melissa's friend Victoria. *Id.* at 1693. Finally, MG testified that no one forced her to recant her allegations. *Id.* at 1744.

**Claim One: The district court violated Quintana's constitutional right to confront his accuser**

**Statement of Exhaustion:** This claim was raised and decided on direct appeal. PExs. 3, 6.

A criminal defendant's right to present witnesses and to confront and to cross-examine witnesses against him are fundamental rights, secured by the Sixth and Fourteenth Amendments. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). Nevertheless, these rights may bow to "accommodate other legitimate interests in the criminal trial process." *Id.* at 295.

In sexual assault prosecutions, Nevada has created a "rape shield law" to balance the defendant's right to confront his accuser with the alleged victim's right to be free from undue harassment. NRS 50.090 is Nevada's "rape shield" law and states:

> In any prosecution for sexual assault or statutory sexual seduction or for attempt to commit or conspiracy to commit either crime, the accused may not present evidence of any previous sexual conduct of the victim of the crime to challenge the victim's credibility as a witness unless the prosecutor has presented evidence or the victim has testified concerning such conduct, or the absence of such conduct, in which case the scope of the accused's cross-examination of the victim or rebuttal must

be limited to the evidence presented by the prosecutor or victim.

Essentially, NRS 50.090 prohibits a defendant in a sexual assault prosecution from introducing evidence concerning the alleged victim's previous sexual conduct to generally attack the alleged victim's credibility by insinuating the victim is unchaste. However, NRS 50.090 "does not bar such evidence where its admission is necessary to protect the defendant's fundamental rights under the Sixth and Fourteenth Amendments, including where the evidence is used to show the victim's prior independent knowledge." *Guitron v. State*, 131 Nev. 215, 225 (Ct. App. Nev. 2015). Indeed, "where the defense uses [prior sexual conduct] not to advance a theory of the victim's general lack of chastity, but to show knowledge or motive, it may be admissible." *Id.*

Prior to trial Quintana filed a Motion and Notice of Intent to admit allegations MG made concerning her cousin AR. AA III 528-542. In October 2017, while meeting with CPS agent Edwards—and then during subsequent therapy sessions—MG reported her cousin AR, then 17 years old, had on separate occasions grabbed MG's breasts and made MG grab his penis when she was approximately nine years old. *Id.* at 534. Quintana sought to admit this evidence under either *Summit v. State*, 101 Nev. 159 (1985) or *Miller v. State*, 105 Nev. 497 (1989). AA III 528.

The State opposed Quintana's motion. *Id.* at 544. The State conceded MG alleged an incident involving AR where he, "tried to get into [MG's] pants. And then he had [MG], um, grab him." *Id.* at 549. Additionally, that AR used his hands to rub MG's vagina and "also grabbed [MG's] hand and had MG touch his penis." *Id.* The State also conceded MG claimed a second incident where AR pinned MG to the couch and "tried to grab her breast." *Id.* Nevertheless, the State argued this

17

evidence was prohibited by NRS 50.90 and were not otherwise admissible under either *Summit* or *Miller*. *Id.* at 550-55.

On July 9, 2018, the court entertained argument on Quintana's motion. *See* AA V 997, 1083-1097. The court entertained further argument on July 31, 2018. *Id.* at 1100-09. The court ultimately denied Quintana's motion. *Id.* at 1105. The court claimed because MG made the AR allegation after she made the allegation concerning Quintana, the AR allegation was not a "prior" false allegation under *Miller*. AA V 1086; 1105. Additionally, assuming the AR allegations were true, the court claimed the AR allegations were not similar to, or descriptive enough, to warrant admission under *Summit*. *Id.* at 1095, 1106. The court filed its written order denying Quintana's motion on August 8, 2018. AA III 558-59.

### A.   NRS 50.090 does not apply to allegations of lewdness with a minor

NRS 50.090 generally prohibits presenting evidence of an alleged victim's previous sexual conduct, "[i]n any prosecution for sexual assault or statutory sexual seduction or for attempt to commit or conspiracy to commit either crime[.]" Quintana contends based upon NRS 50.090's clear statutory language, the prohibition codified in the statute does not apply to allegations of Lewdness with a Minor.

Indeed, "[w]hen interpreting a statute, legislative intent 'is the controlling factor.'" *State v. Lucero*, 127 Nev. 92, 95 (2011) (citing *Robert E. v. Justice Court*, 99 Nev. 443, 445 (1983)). To determine legislative intent, this Court must first look to the plain language. *Lucero*, 127 Nev. at 95. "[W]hen a statute "is clear on its face, a court cannot go beyond the statute in determining legislative intent." *Id.*

Here, the statute's plain language only prohibits evidence concerning "any previous sexual conduct of the victim" when the State prosecutes a charge of Sexual Assault, Statutory Sexual Seduction and the attempts thereof, not when the State

18

prosecutes a charge of Lewdness with a Minor. This plain reading of NRS 50.090 controls. Thus, when the State prosecutes a defendant for committing lewd acts, the standard for admissibility regarding an alleged victim's prior sexual conduct should be simple relevance, which is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." NRS 48.015.

Here, evidence that MG made identical allegations of abuse against her cousin, while recanting her allegations against Quintana, was highly relevant in this case. The evidence suggested MG may have lied about Quintana committing lewd acts upon her. Indeed, the evidence had "any tendency" to show that AR and not Quintana committed the alleged offenses. Given the low threshold for admissibility regarding relevant evidence, the district court abused its discretion by refusing to allow Quintana to question MG about the AR allegations.

To the extent Quintana failed to raise this precise argument in the district court, Quintana notes this Court has generally addressed unpreserved constitutional questions for the first time on appeal. *See McCullough v. State*, 99 Nev. 72, 74 (1983). Thus, because the proper interpretation of NRS 50.090 implicates Quintana's constitutional right to confront his accuser, this Court should address the argument on appeal and reverse Quintana's conviction.

Alternatively, unpreserved errors are reviewable for plain error on appeal. Under plain error, "an error that is plain from a review of the record does not require reversal unless the defendant demonstrates that the error affected his or her substantial rights, by causing 'actual prejudice or a miscarriage of justice.'" *Valdez*, 124 Nev. at 1190.

Here, the error is plain because it "reveals itself by a casual inspection of the record." *Saletta v. State*, 127 Nev. 416, 421. The plain language of NRS 50.090 clearly only prohibits evidence concerning an alleged victim's prior sexual conduct

in prosecutions for sexual assault and not lewdness with a minor. Additionally, the court's refusal to allow Quintana to present the evidence affected Quintana's substantial right to confront his accuser.

Finally, the error caused actual prejudice or a miscarriage of justice. The jury acquitted Quintana of seven (7) charges at trial. *See* AA III 821-22. The jury only convicted Quintana for charges similar to the AR allegations. Thus, the jury clearly believed MG lacked credibility. Had Quintana been able to introduce evidence concerning the AR allegations the jury would have acquitted Quintana of counts 1 and 2 as well. Accordingly, this Court should reverse Quintana's conviction.

## B.    The district court abused its discretion when it denied Quintana's motion under *Miller v. State*

Assuming the AR allegations were false, the allegations were admissible under *Miller v. State*, notwithstanding NRS 50.090. In *Miller*, 105 Nev. at 500-01, this Court held NRS 50.090 does not prohibit cross examining the alleged victim regarding false accusations of sexual abuse because "prior false accusations of sexual abuse or sexual assault by complaining witnesses do not constitute 'previous sexual conduct' for rape shield purposes." *Id.* Essentially, evidence concerning false allegations of sexual abuse are admissible because the evidence is not presented to suggest the alleged victim is of unchaste character, which NRS 50.090 seeks to prevent. Rather, the evidence is introduced simply for impeachment. *Miller*, 105 Nev. at 501 ("the defendant seeks to prove for impeachment purposes that the complaining witness has, in the past, made false accusations concerning sexual behavior."). Thus, nothing contained in what is colloquially referred to as the "Rape Shield Law" prevents the defense from cross-examining the alleged victim regarding any prior false accusations of sexual abuse.

Nevertheless, the admissibility of a victim's false allegations is subject to procedural and evidentiary rules. This Court established a three-prong test for false

20

sexual abuse allegation admissibility. First, the defendant must notice his intent to cross-examine the alleged victim regarding false allegations. *Id.* at 502. Second, at a hearing outside the jury's presence, "the defendant must establish, by a preponderance of the evidence, that (I) the accusation or accusations were in fact made; (2) that the accusation or accusations were in fact false; and (3) that the evidence is more probative than prejudicial." *Id.* Provided the defendant "satisfies these three conditions, the trial court will authorize cross-examination of the complaining witness concerning the alleged false accusations." *Id.* (emphasis added).

Years later, in *Abbott v. State*, 122 Nev. 715, 733 (2006), this Court expressed concern "over the rigor of *Miller*'s standards and procedure." Therefore, this Court "ordered the patties to provide supplemental briefing discussing whether we should revisit and revise *Miller*." *Id.* Bizarrely, Abbott's counsel declined the invitation and instead "argued that *Miller* should not be revisited because *Miller* strikes the right balance and the threshold for admission is not an exceedingly high threshold." *Id.* Thus, this Court affirmed *Miller* while noting, "[i]n our opinion, with which Abbott would likely agree, Abbott's attorney should have taken this opportunity to advocate for a lowered evidentiary burden." *Id.*

### 1.    This court should abrogate *Miller*

In *Abbott* this Court all but announced that *Miller* should be abrogated and evidence concerning an alleged victim's previous false allegations should be subject to a lower evidentiary threshold. Although Abbott's counsel declined this Court's invitation to advocate for a reduced burden, Quintana respectfully requests this Court now abrogate *Miller*.

As noted, when a defendant seeks to admit evidence that an alleged victim made prior false sexual abuse allegations he must establish "by a preponderance of the evidence, that (1) the accusation or accusations were in fact made; (2) that the

accusation or accusations were in fact false; and (3) that the evidence is more probative than prejudicial." *Abbott*, 121 Nev. at 733 (emphasis added). This Court described the "preponderance of the evidence" standard as one that "should lead the trier of fact to find that the existence of the contested fact is more probable than its nonexistence." *Brown v. State*, I 07 Nev. 164, 166 (1994) (quoting Edward W. Cleary, *McCormick on Evidence* § 339 (3d ed. 1984)). Additionally, "proof of falsity must be more than a bare, unsupported opinion that the complaining witness is lying [;] ... false allegations require some independent factual basis of falsity in order to be admissible in evidence." *Id.*

This standard remains problematic. First, if NRS 50.090 does not apply to evidence concerning false allegations, because the evidence cannot be used to suggest an alleged victim is unchaste, there is no need for a special evidentiary test. Rather, if the prior allegation is false then the evidence merely challenges the alleged victim's credibility. Evidence concerning an alleged sexual abuse victim's credibility should therefore be subject to the same admissibility standards as any other evidence concerning credibility.[15]

Additionally, the "preponderance of the evidence" standard—one which, "should lead the trier of fact to find that the existence of the contested fact is more probable than its nonexistence"—is inappropriate for use in a pre-trial admissibility hearing. This standard requires the trial court to speculate on how the jury may view the evidence. However, when the constitutional right to confront an accuser is at issue, courts should not decide evidentiary questions based upon unascertainable outcomes.

Moreover, if a defendant is asserting the allegation against him is false, because the alleged victim previously made another false allegation, it would

---

[15]*See* NRS 50.085.

naturally appear to a potential juror that the allegation of prior falsity is merely self-serving. Thus, a defendant will seldom meet the "preponderance of the evidence" burden.

Similarly, a requirement that the defendant establish an "independent factual basis for falsity," assumedly by a preponderance of the evidence, is an almost impossible standard to meet. Certainly, something more than a bare assertion that an alleged victim made other false allegations may be required. However, as this Court recognized in Abbott, "it is often difficult to prove that prior accusations are false." *Abbott*, 122 Nev. at 735.

Indeed, requiring "an independent factual basis" actually obligates a defendant to produce more "proof" that the allegation is actually false than the proof required "to lead the trier of fact to find the existence of the contested fact is more probable than its nonexistence." Essentially, the burden on proving falsity is higher than the preponderance standard. Indeed, "an independent factual basis" requires a defendant to prove a negative—that the alleged victim's allegations concerning other sexual abuse were in fact false. However, very rarely would proof of falsity, by a preponderance of the evidence, be available to a defendant.

A defendant generally does not have access to police reports, medical records, or witnesses surrounding a false allegation—assuming the alleged victim even reported the false allegation to authorities. Thus, any "evidence" concerning the false allegation is beyond the defendant's control. This is especially true where the false allegation involved an alleged incident occurring years before the current allegation. In those cases the "evidence," assuming it even exists, would be either stale and/or unpreserved.

Additionally, under the circumstances here, MG made the AR allegation while Quintana sat in jail awaiting trial. Thus, Quintana had no ability to control the investigation concerning the AR allegations. Although police apparently

"investigated" the allegations, they decided not to pursue any charges against AR. Therefore, police had the unilateral power to declare the allegation false, true, or requiring further investigation.[16]

Finally, although Quintana at least initially had funds to hire an attorney, many defendants do not and instead, rely upon the Public Defender's Office. Given public defender caseloads and financial limitations, requiring public defenders to investigate potentially prior false allegations and then "prove" the allegation is indeed false is unrealistic. Additionally, and practically, placing this burden on the defendant presupposes that prosecutors learn about false allegations and then disclose that information to defendants. This could create unforeseen problems during post-conviction litigation. In any event, based upon these legitimate concerns, this Court should now abrogate *Miller*.

### 2. Under *Miller*, the district court erred by prohibiting Quintana from questioning MG regarding the AR allegations

Assuming this Court declines to abrogate *Miller* and adopt a less onerous standard for admissibility, Quintana's district court nevertheless erred when it denied Quintana's motion. Citing *Miller*, the court denied Quintana's motion solely because MG made the AR allegation after she disclosed the allegations concerning Quintana. AA V 1083, 1086, 1105. Essentially, the court found—assuming the allegations against AR were false—that the AR allegations were not admissible because they were not disclosed "prior" to the allegations against Quintana. *Id.* This decision was arbitrary, capricious, beyond the bounds of law or reason, and therefore, an abuse of discretion.

---

[16]The State acknowledged at the hearing on Quintana's motion, "the fact that the police failed—decide not to pursue a case doesn't mean that it's a false allegation. I mean, these things could very well have happened to her . . . and they could still be true." AA V 1087.

24

There is not a single decision from this Court or the Nevada Court of Appeals mandating that an alleged sexual assault victim make a false allegation before making the allegation against the defendant to be admissible under *Miller*.[17] Indeed, the district court's decision is totally illogical. If "prior" false allegations are admissible notwithstanding NRS 50.090, because the allegations cannot be used to prove an alleged victim is unchaste and instead are introduced to challenge an alleged victim's credibility, it should not matter when the "prior" false allegation is made. It only matters that the false allegation was in fact made. The sequence is unimportant. The falsity is what is important.

### 3. Assuming the district court believed that the AR allegations provided an alternate suspect, *Miller* would not apply

During argument on Quintana's motion the district court suggested when MG made the AR allegations, while recanting the allegations against Quintana, the AR allegations provided an alternate suspect for MG's alleged abuse. AA V 1089. Therefore, impliedly, the court suggested the AR allegations were not false. Assuming this is true, *Miller* would not apply in Quintana's case. Indeed, if the evidence provided an alternative suspect then strictly speaking, it was not offered to show the allegation was false. Accordingly, falsity was not in issue and therefore, the district court erred by denying the motion under *Miller*.

### C. The district court abused its discretion by denying Quintana's motion pursuant to *Summitt v. State*

If the AR allegations were true, then NRS 50.090 potentially applied in Quintana's case. However, MG's sexual conduct with AR would potentially be

---

[17]There are unpublished decisions recognizing a "prior" false allegation can be made after the allegation against the defendant, but unfortunately those decisions pre-date January 1, 2016 and therefore are not citable even as persuasive authority. *See* NRAP 36(c)(3).

admissible as an exception to NRS 50.090's prohibition against admitting evidence of an alleged victim's previous sexual conduct.

As this Court explained in *Summitt*, NRS 50.090 must be construed to "avoid any conflict with the constitution." *Summitt*, 101 Nev. at 160. Thus, subject to a balancing test, a defendant has the right to present evidence concerning an alleged victim's prior sexual conduct as an alternate source of sexual knowledge. *Id.* at 163. The defendant's ability to introduce this evidence is particularly important because a jury is likely to believe that when a child describes sexual conduct the conduct must have occurred, "otherwise, she could not have described it." *Id.* at 164. However, if the victim had "other sexual experiences, it would be possible for them to provide detailed, realistic testimony concerning an incident that may never have happened[.]" *Id.*

Here, after assuming MG's allegations against AR were true, the district court nevertheless denied Quintana's motion concluding MG's allegations against AR were not "similar" to, or sufficiently descriptive when compared to the allegations against Quintana. AA V 1095-96, 1106. Specifically, and based solely on the CPS and police reports documenting MG's allegations against AR, the court felt MG did not provide enough detail regarding the AR allegations which would suggest sexual knowledge. AA V 1095-96, 1106-07.

This decision was clearly erroneous. This Court has never held that a victim's prior sexual conduct must be "similar" to the defendant's alleged abuse to be admissible under NRS 50.090. In fact, quite the opposite.

For example, in *Williams v. State*, 134 Nev. 687, 698-99 (2018), the State alleged the defendant sexually assaulted one minor victim on numerous occasions and committed lewd acts on another minor victim as well. *Id.* at 688. To defend himself the defendant sought to introduce evidence "that the two young girls, 10 and 12 years old, knew enough about sex to have fabricated their allegations." *Id.* at

696. Specifically, the defendant desired to present "evidence that the girls' mother sold sex toys and performed in pornographic films from their home. *Id*. The State objected relying upon NRS 50.096. *Id*. The court scheduled a hearing where the victims were supposed to testify. *Id*.

The day before the hearing the defendant's attorney interviewed the victims without mother's permission. *Id*. In response, the court cancelled the hearing while suggesting the defendant prejudiced the victims. *Id*. at 697. However, the court noted the defendant could re-file his motion. *Id*. One year later, and 12 days before trial, the defendant re-filed his motion. *Id*. Without conducting any hearing, the court denied the motion claiming the proffered evidence lacked relevance unless the State argued at trial that the victims could not make up allegations because they were sexually innocent. *Id*.

On appeal after conviction this Court reversed. This Court recognized the district court erred by not conducting a formal hearing on defendant's motion. This Court also noted, "when a defendant moves to admit evidence to show that a young victim has the knowledge to contrive sexual allegations, a district court should afford the defendant an opportunity, outside the jury's presence, to show that 'due process requires the admission of such evidence because the probative value in the context of that particular case outweighs its prejudicial effect on the [victim].'" *Williams*, 134 Nev. at 698 (emphasis added). Thus, on remand, this Court suggested "[t]he district court may find it appropriate to examine the girls under oath to help determine the probative value" of the proffered evidence. *Id*.

Clearly, knowledge concerning sex toys and pornography is not "similar" or descriptive as the acts alleged against the defendant in *Williams*. Nevertheless, this Court reversed the defendant's conviction specifically because the district court refused to consider that the evidence may be sufficient to provide the victim's with sexual knowledge.

Similarly, in *Guitron*, 131 Nev. at 224-25, the defendant on trial for sexual assault sought to admit evidence that the victim had "vast sexual knowledge" based upon "viewing Internet pornography with her friend from middle school." In finding the district court erred in denying Guitron's request to admit the evidence, the Nevada Court of Appeals first noted "Guitron did not seek to admit evidence that the victim had watched Internet pornography to muddy the victim's reputation or to attack her credibility; rather, he sought to bolster his defense through the statement he made to police that this victim had prior knowledge of sex, wanted to experience sex as a result of her curiosity, and consented to have sex with him." *Id.* at 227. Therefore, the evidence was relevant "to [Guitron's] defense of statutory sexual seduction, and was more probative than prejudicial considering the facts of this case." *Id.*

Based upon both *Williams* and *Guitron*, Quintana's district court manifestly erred in denying the motion to admit the AR allegations because those allegations were not "similar" or sufficiently descriptive when compared to the allegations against Quintana.[18] As Nevada Appellate Courts have made abundantly clear, a victim's prior sexual conduct need not be "similar" or sufficiently detailed to be admissible under *Summitt*. Rather, the prior sexual conduct simply must provide the alleged victim sexual knowledge so that a jury does not believe due to the victim's age she could not possibly falsely accuse the defendant of sexual abuse.

### 1. The district court did not conduct an adequate pre-admissibility hearing

The district court also erred because it failed to comply with the procedure mandated when a defendant seeks to admit evidence of an alleged victim's prior

---

[18]Ironically, MG never described the penis-touching or groping allegation against Quintana in any detail either—let alone enough detail that the district court demanded of the AR allegations.

sexual conduct to establish sexual knowledge. In *Guitron*, the Nevada Court of Appeals held when a defendant seeks to introduce evidence concerning an alleged victim's prior sexual conduct, and "where its admission is necessary to protect the defendant's fundamental lights under the Sixth and Fourteenth Amendments, including where the evidence is used to show the victim's prior independent knowledge[,]" he must make a detailed offer of proof concerning the evidence. *Guitron*, 131 Nev. at 227. Then, the district court must conduct a hearing and the defendant "must present justification for admission of the evidence, detailing how the evidence is relevant to the defense under the facts in the case." *Id.* Thereafter, the court must "weigh the probative value of the proffered evidence against its prejudicial effect." *Id.* Importantly, "[i]n weighing the offer of proof, the district court must consider the prejudicial effect to the truthfinding process, as well as whether this evidence may confuse the issues, mislead the jury, or cause the jury to decide the case based on an improper or emotional basis." *Id.* Finally, the hearing must occur on the record, the court must "state on the record its findings of fact and conclusions of law, detailing what evidence shall be admissible and what evidence will not be admissible according to its ruling."[19] *Id.*

Here, Quintana made an adequate offer of proof concerning the AR allegations. Quintana and the State provided the district court with CPS records and the North Las Vegas Police Department reports documenting that MG made the AR allegations. *See* AA V 1091. Unfortunately however, the district court did not afford Quintana a genuine opportunity to justify the evidence's admission under the facts of his case because the court pre-emptively, and erroneously, decided the AR allegations were insufficiently descriptive and similar to the allegations against

---

[19]This Court explicitly adopted the appellate court's procedure in *Williams*, 134 Nev. at 698-99.

Quintana—which is immaterial under *Summitt*. Moreover, Quintana likely couldn't make any further offer of proof without an evidentiary hearing. Quintana was in jail when MG made the AR allegations. Quintana was not privy to the circumstances surrounding the allegations. Thus, to assuage the district court's feigned concern regarding the AR allegations' descriptiveness or similarity, the court should have conducted an evidentiary hearing and afforded both parties an opportunity to cross-examine MG and any other witnesses concerning the AR allegations before Quintana would be required to justify admission. *See Williams*, 134 Nev. at 699.

Additionally, because the district court erred fundamentally in its *Summitt* analysis, the court never weighed the evidence's probative value against any supposed prejudicial effect. Nevertheless, assuming the AR allegations were true, and that AR subjected MG to unwanted sexual acts, then Quintana would not have admitted that evidence to suggest MG was unchaste. Therefore, it is unclear exactly how the evidence could ever be "prejudicial" to MG. Rather, there would be no prejudice whatsoever, especially when balanced against the evidence's obvious probative value. Finally, the court did state its findings on the record. However, its findings were so grossly, obviously, and fundamentally, inconsistent with this Court's precedent, they amount to a clearly erroneous abuse of discretion.

### D.    The district court's error was not harmless

This Court reviews a district court's decision to admit or exclude evidence under NRS 50.090 for an abuse of discretion and harmless error. *See generally Mclellan v. State*, 124 Nev. 263, 267 (2008); NRS 178.598. "An abuse of discretion occurs if the district court's decision is arbitrary or capricious or if it exceeds the bounds of law or reason." *Crawford v. State*, 121 Nev. 744, 748 (2005). Moreover, because the right to confront an accuser is a fundamental constitutional right (*see Chambers*, 410 U.S. at 294), the error is harmless only if the State demonstrates,

"beyond a reasonable doubt, that the error did not contribute to the verdict." *Valdez v. State*, 124 Nev. 1172, 1189 (2008) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Quintana's case was very close. The jury acquitted Quintana of seven counts, thus confirming the jury had concerns regarding MG's credibility. AA IV 821-22. Moreover, the AR evidence was vital to Quintana's defense. Quintana asserted that MG falsely accused him of sexual abuse. Similarly, Quintana asserted he falsely "confessed" due to his suggestibility, law enforcement pressure, and his desire to be reunited with his family—including his wife who was nine months pregnant at the time. Had the jury been able to hear evidence that MG either made other false allegations against her cousin, that she had been abused by AR but blamed Quintana, or that she had been abused by AR thus providing her sexual knowledge sufficient to falsely accuse Quintana—for whatever reason, it is substantially likely the jury would have acquitted Quintana of the remaining two counts.

Thus, because the district court's erroneous decision regarding the AR allegations impacted Quintana's fundamental, constitutional, right to confront his accuser, the error can only be harmless if the State proves "beyond a reasonable doubt" the error did not contribute to the verdict. The State cannot meet this burden and accordingly, Quintana respectfully requests this Court reverse his convictions.

**Claim Two: The district court violated Quintana's Due Process right to a fair trial by admitting prejudicial bad act evidence**

**Statement of Exhaustion:** This claim was raised and decided on direct appeal. PExs. 3, 6.

Pursuant to NRS 48.045(1)(a), "[e]vidence of a person's character or a trait of his or her character is not admissible for the purpose of proving the person acted in conformity therewith on a particular occasion, except ... [e]vidence of a person's

character or a trait of his or her character offered by an accused, and similar evidence offered by the prosecution to rebut such evidence." When character evidence is admissible, "proof may be made by testimony as to reputation or in the form of an opinion" and "[o]n cross-examination, inquiry may be made into specific instances of conduct." NRS 48.055(1) (emphasis added). Essentially, "once a criminal defendant presents evidence of his character or a trait of his character the prosecution may offer similar evidence in rebuttal[]" and that rebuttal evidence "must be in the form of reputation or opinion testimony." *Daniel v. State*, 119 Nev. 498, 512 (2003) (emphasis added). On cross examination a party test may then test the character opinion or reputation evidence "by inquiry into the witness's knowledge of specific instances of conduct." *Id.* (emphasis added).

Importantly, on direct examination a patty cannot question regarding specific acts to test the character evidence because the accused would not have been confronted with the evidence. *See Roever v. State*, 114 Nev. 867, 871 (1998). Thus, when the defendant places his character in issue via a State's witness, any rebuttal character evidence is limited to opinion or reputation evidence and not evidence concerning specific acts. *Id.* at 876 (Maupin, J., concurring). Nevertheless, assuming specific acts are admissible, the mere fact the witness had been arrested is not an adequate basis to cross-examine regarding the witness's reputation or opinion. *Daniel*, 119 Nev. At 512. The specific acts and circumstances surrounding an arrest may be proper, but before those facts are admissible "the trial court must determine, outside the presence of the jury, whether the prosecution has a reasonable, good-faith basis for its belief that the defendant committed the acts subject to the inquiry." *Id.* Finally, "extrinsic prior bad act evidence is always collateral and therefore inadmissible to attack credibility." *Lobato v. State*, 120 Nev. 512,519 (2004).

On appeal, this Court reviews the admission of improper character evidence for abuse of discretion and non-constitutional harmless error. *Newman v. State*, 129 Nev. 222, 236 (2013). Under this standard this Court will deem the error harmless unless the error, "had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 236 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

**A.   The district court erroneously allowed the State to use a bad act to rebut opinion/reputation character evidence**

The State called Melissa to testify at trial. *See* AA VIII 1802. Because the State called Melissa in its case in chief, the State conducted Melissa's direct examination. During cross-examination, the following exchange occurred between Quintana and Melissa:

Q:    Is (sic) someone puts pressure on Nestor, he usually gives into the pressure?

A:    Yes.

Q:    He's easily taken advantage of?

A:    Yes.

Q:    He does very poorly with salespeople?

A:    Yes.

Q:    He buys pretty much whatever anybody's selling him?

A:    Yes.

AA IX 1939-40.

On cross-examination, the following exchange occurred between the State and Melissa:

Q:    Mr. Wooldridge was asking you about the defendant's mental state and how he responded to conflict; do you remember those questions?

A:    Yes.

33

1      Q:     Did you ever have arguments with him?

2      A:     Yes.

3      Q:     I mean, you're married; right?

4      A:     Yeah.

5      Q:     Okay. And whenever you had arguments with him, would he

6   participate in those arguments?

7      A:     Sometimes or he would just stand there and listen to me.

8      Q:     Okay. Did he ever yell back?

9      A:     Sometimes.

10     Q:     Okay. And did you fight like normal couples?

11     A:     I don't know what a normal couple is.

12     Q:     Okay. Well, did you have arguments with him?

13     A:     Yeah.

14     Q:     All right. Did they ever get heated?

15     A:     Yes.

16     Q:     All right. Whenever you had arguments and they got heated, did he

17  just shrink and leave the room or not respond?

18     A:     Yeah.

19     Q:     That's how he would react?

20     A:     Yes.

21     Q:     All the time?

22     A:     Yes.

23  *Id.* at 1968-69.

24          At a subsequent bench conference the State advised, "so there's an incident of

25  domestic violence between the two of them," and "I think that now the State is

26  entitled to get into that." *Id.* at 1969. Quintana argued, "they just opened the door

27  themselves judge." *Id.* at 1970. The court disagreed with Quintana noting, "the

34

whole thing about the stress and how he handles stress, and he caves to everything. You opened that door. So I don't know what this is all about, but I would agree that—the going into—Yeah."[20] *Id.* at 1970. The court also suggested, "clearly she wasn't truthful." *Id.* at 1973. Thereafter, upon questioning by the State, Melissa confirmed the 2011 domestic violence incident, confirmed she called police, and confirmed upon police arrival Melissa advised Quintana's PTSD caused the incident.[21] *Id.* at 1981.

The district court abused its discretion by allowing the State to introduce evidence regarding the 2011 domestic violence incident. First, the State called Melissa to testify. Therefore, assuming Quintana placed his character in issue, the State could not inquire into or impeach with specific acts as it was not cross-examining Melissa. *See* NRS 48.055(1). Assuming this Court overlooks this fatal flaw, and considers the State's re-direct examination as some sort of "rebuttal," Quintana was nevertheless correct—the State improperly "opened" its own door.

Moreover, even if allowed, the evidence the State desired to present had to be "similar" to the character evidence Quintana introduced through Melissa. *See* NRS 48.055(1 ); *Daniel*, 119 Nev. at 512. Here, Quintana did not elicit evidence that he was not a violent person. Rather, Quintana merely presented character evidence that he is mentally impaired and easily manipulated.

---

[20]Although the State wanted to question Melissa about the facts underlying the alleged 2011 domestic violence incident, and introduce evidence that Quintana had been arrested, the court only allowed the State to question Melissa about the fact there was a domestic violence incident in 2011, that she called the police, police responded and deemed Quintana the "initial aggressor," and Quintana's PTSD caused the incident. *Id.* at 1775-76, 1979-80.

[21]When asked, "Isn't it true that the defendant was determined to be the initial or primary aggressor in that incident," Melissa replied she did not know. *Id.* at 1981.

Moreover, Quintana did not elicit evidence concerning specific incidents to demonstrate he is mentally impaired and easily manipulated. Rather, Melissa simply testified generally, i.e., in her opinion, that due primarily to PTSD, when Quintana is pressured he "gives in" easily and is susceptible to man's defense theory that he falsely confessed under law enforcement and familial pressure. On re-direct the State could have inquired into Quintana's reputation for intelligence or sophistication. Likewise, in rebuttal the State could have called other witnesses to testify as to their opinion regarding Quintana's reputation for intelligence or sophistication because that evidence would be relevant impeachment evidence for the purpose to which Quintana introduced Melissa's opinion testimony. What the State could not do, and what the district court allowed the State to do here, is impeach its own witness with a specific incident suggesting Quintana is a violent person. Simply put, evidence that Quintana once fought with his wife, resulting in police intervention, is in no way "similar" to evidence Quintana is cognitively challenged and therefore, impressionable and easily manipulated.

### 1.    The district court's error was not harmless

The district court essentially allowed the State to introduce irrelevant evidence of Quintana's supposed criminality without complying with pre-admissibility requirements.[22] *See* NRS 48.045(2); *Newman*, 129 Nev. at 230. Moreover, the court failed to provide the jury with a limiting instruction as well.[23] *See Tavares v. State*, 117 Nev. 725, 733 (2001) ("the court, "should give the jury a

---

[22]"The test for determining whether a statement [or evidence] refers to prior criminal history is whether the jury could reasonably infer from the facts presented that the accused had engaged in prior criminal activity." *Thomas v. State*, 114 Nev. 1127, 1141 (1998).

[23]The court did provide an instruction within the other jury instructions given at the close of evidence. *See* AA IV 814. This fact essentially proves that the evidence was, in fact, bad act evidence.

specific instruction explaining the purposes for which the evidence is admitted immediately prior to its admission[.]").

This Court has noted that "the use of uncharged bad act evidence to convict a defendant is heavily disfavored in our criminal justice system because bad acts are often irrelevant and prejudicial and force the accused to defend against vague and unsubstantiated charges." *Id.* at 725 (emphasis added). Indeed, "[e]vidence of uncharged misconduct may unduly influence the jury, and result in a conviction of the accused because the jury believes he is a bad person" *Crawford v. State*, 107 Nev. 345,348 (1991).

Here, not content with improperly informing the jury regarding Quintana's prior domestic violence incident with his wife, the State fallaciously argued to the jury that the domestic violence incident six years earlier "proved" Quintana's PTSD does not affect his decision-making nor susceptibility to manipulation. Specifically, the prosecutor argued:

> And [Melissa] wasn't honest with you on the stand about how the defendant's PTSD affects him. Now, no one's disputing the defendant has PTSD. And that's a horrible condition to suffer from. But remember, [Melissa] was painting this picture of a man who just completely shrinks from conflict. Who completely just—even when they were arguing, and remember I asked her, what about, you know, you're a couple. You've been together for years. Everyone has arguments. Does he just shrink and you just yell and he leaves and goes out of the room or how does that work. And she literally told me, yes, that's exactly how it happens.

> But yet several years prior to this incident there was a domestic violence incident between the two of them, where she called the police and again she indicates that it's his PTSD that caused this.

AA XII 2668-69. As noted however, Quintana did not question Melissa about her opinion as to whether he "shrinks from conflict," as the State suggested. Moreover, a

person can be manipulated due to cognitive difficulties while also have violent episodes. These two characteristics have nothing to do with each other.

Worse, during rebuttal argument the State used Quintana's prior domestic violence incident to explicitly argue it proved Quintana was a violent person capable of committing the charged crimes. For example, the prosecutor explicitly argued, "[Quintana] gets mean and he gets violent." AA XII 2733. Additionally, "[i]f he just shrivels and just kind of crumbles, why is everyone so afraid to confront him with things, and I submit to you it's because that's not how he acts. He gets mean and he gets violent. Just how [MG] talked to Detective Correa, about when she wouldn't cooperate with him. How he slapped her. How he would throw her to the ground. That is more of how this defendant acts when he's confronted with things." *Id.*

Given this Court's well-established apprehension concerning bad act evidence's influence on the jury, the aforementioned error clearly had a "substantial and injurious effect or influence in determining the jury's verdict." The legitimate evidence against Quintana was not overwhelming. Yet, by portraying Quintana as a violent domestic abuser, as well as a pedophile, the State ensured the jury would convict not on the strength of its case but rather because the jury believed Quintana to be a criminally disposed person. Accordingly, the error was not harmless and Quintana respectfully requests this Court reverse his convictions.

**Claim Three: The State violated Quintana's fundamental right to a fair trial by committing prosecutorial misconduct**

**Statement of Exhaustion:** This claim was raised and decided on direct appeal. PExs. 3, 6.

This   Court applies a two-step  approach to claims of prosecutorial misconduct. *Valdez*, 124 Nev. at 1188. First, the Court determines if the prosecutor did something improper. *Id.* If the prosecutor did something improper the Court must then determine whether the behavior warrants reversal. *Id.* Generally, this

Court will not reverse a conviction if the misconduct was harmless. *Id.* The proper harmless error standard depends upon whether the prosecutorial misconduct was of a constitutional dimension. *Id.* at 1189. Non-constitutional prosecutorial misconduct is reversible "only if the error substantially affected the jury's verdict." *Id.* Conversely, misconduct of a constitutional dimension warrants reversal "unless the State demonstrates, beyond a reasonable doubt, that the error did not contribute to the verdict." *Id.* Non-constitutional prosecutorial misconduct can also reach a constitutional dimension if "in light of the proceedings as a whole, the misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

## A.   Prosecutors disparaged Quintana and his attorney and asked the jurors to place themselves in MG's position

Prosecutors generally cannot undermine the defense and make inappropriate and unfair characterizations during trial. *Riley v. State*, 107 Nev. 205, 213 (1991). Moreover, a prosecutor cannot disparage or belittle a defendant or his counsel. *McGuire v. State*, 100 Nev. 153 (1984); *see also Butler v. State*, 120 Nev. 879, 898 (2004) ("Disparaging remarks directed toward defense counsel have absolutely no place in a courtroom, and clearly constitute misconduct. And it is not only improper to disparage defense counsel personally, but also to disparage legitimate defense tactics.") (internal citations omitted); *see also* Charles L. Cantrell, *Prosecutorial Misconduct: Recognizing Errors in Closing Argument*, 26 Am. J. Trial Advoc. 535; Bennett L. Gershman, *Prosecutorial Misconduct* § 11:3 (2d ed.) (2017) ("Prosecutors often employ insulting and abusive rhetoric to denigrate defendants. Such language not only is calculated to inflame juries but also to suggest habitual criminal behavior."); James W. Gunson, *Prosecutorial Summation: Where is the Line Between "Personal Opinion" and Proper Argument*, 46 Me. L. Rev. 241, 252 (1994) ("A common means employed by prosecutors to inflame the jury's emotion is abusive

name-calling. This type of attack can be highly effective and the legal digests are full of case law finding these colorful terms both proper and improper. Like other forms of prosecutorial misconduct, disparaging remarks are impermissible because they lighten the state's burden of proof by engendering in the jury feelings of prejudice, fear, and loathing towards the defendant. The remarks are also objectionable because they disturb the decorum of the court proceedings and the dignity of the prosecutorial office."); ABA Standards for Criminal Justice, *The Prosecution Function*, Rule 3-5.8(c)-(d) (3d ed. 1993) ("The prosecutor should not make arguments calculated to appeal to the prejudices of the jury" and "should refrain from argument which would divert the jury from its duty to decide the case on the evidence."). Finally, it is improper for a prosecutor to suggest the jury place itself in the alleged victim's place. *See McGuire*, 100 Nev. at 157, 677 P.2d at 1064.

Here, during rebuttal closing argument the prosecutor repeatedly disparaged Quintana's defense strategy and his attorney. The State claimed Quintana's defense theory and his attorney were "ridiculous," "bizarre," and "absurd." See AA XII 2721 ("I mean, that's ridiculous"); *id.* at 2722 ("Well, that's bizarre"); *id.* at 2730-31 ("he gives this ridiculous story about his enlarged breasts and nipples in him like [MG] would twist his nipples... that story's absurd."); *id.* at 2731 ("when confronted on how ridiculous that is[.]"); *id.* at 2735 ("And then, you know, Mr. Wooldridge, kind of made this ridiculous scene about the letter that grandmother wrote."); *id.* at 2736 ("And that's why it keeps changing and why we hear like these ridiculous things about her fantasy life online."). Additionally, the State disparaged Quintana by arguing he is a violent person. *Id.* at 2733 ("He gets mean and he gets violent."). Moreover, the prosecutor attempted to explain MG's recantations by encouraging the jurors to place themselves in MG's position asking, "What do you think you would feel like if you had to look at photographs of your abuser all over the place that you live in." *Id.* at 2668.

Unfortunately, Quintana's trial attorney failed to object to these instances of prosecutorial misconduct. Failure to object to trial errors, including prosecutorial misconduct, generally precludes appellate review. *Rose v. State*, 123 Nev. 194, 208 (2007). However, this Court will consider unpreserved prosecutorial misconduct if the misconduct "had a prejudicial impact on the verdict when viewed in the context of the trial as a whole... or seriously affects the integrity or public reputation of the judicial proceedings." *Id.* at 209 (citing *Gaxiola v. State*, 121 Nev. 638, 654 (2005)). Importantly however, where errors "are patently prejudicial and inevitably inflame or excite the passions of the jurors against the accused, the general rule [waiver] does not apply." *Garner v. State*, 78 Nev. 366, 372-73 (1962) (internal citations omitted). Indeed, "[j]udges who see bad behavior by those appearing before them, especially prosecutors who wield great power and have greater ethical responsibilities, must hold such misconduct up to the light of public scrutiny." Hon. Alex Kozinski, *Preface*, 44 Geo. L.J. Ann. Rev. Crim. Proc. iii, xxxvi (2015).

Here, the prosecutorial misconduct is plain from the record. The prosecutor repeatedly disparaged Quintana personally and disparaged his counsel and his defense theory. Additionally, the prosecutor clearly suggested the jurors place themselves in MG's position to help explain MG's recantations. Moreover, the prosecutor clearly relied upon improperly admitted bad act evidence to suggest Quintana was a violent person—an allegation totally irrelevant to whether MG's recantations believable. This misconduct prejudicially impacted the verdict as demonstrated by the jury's decision to convict on only two charges. Essentially, although the jury did not believe MG's allegations, it nevertheless convicted based upon the State's misconduct.

Finally, the prosecutor's behavior seriously affected the integrity or public reputation of the judicial proceedings. This Court should hold prosecutors to the highest standards, especially when prosecutorial malfeasance can result in

1
2
3
4

defendants spending decades in prison. Accordingly, although plain error should not apply in Quintana's case (*see Garner*, 78 Nev. at 372-73), to the extent this Court believes it does, based upon the prosecutors' egregious misconduct this Court should reverse Quintana's convictions.

5
6

**Claim Four: The district court erred in rejecting Quintana's proffered jury instruction**

7
8

**Statement of Exhaustion:** This claim was raised and decided on direct appeal. PExs. 3, 6.

9
10
11
12
13
14
15
16

While the district court "has broad discretion to settle jury instructions" it is nevertheless responsible for ensuring that the jury is fully and correctly instructed regarding the law governing the case. *Crawford v. State*, 121 Nev. 744, 748 (2005). Additionally, "[i]f the court believes that [a proffered instruction] is pertinent and an accurate statement of the law, whether or not the charge has been adopted as a model jury instruction, it must be given." NRS 171.161(3). This Court generally reviews the district court's decision to either give or refuse a proposed jury instruction for an abuse of discretion. *Crawford*, 121 Nev. at 754-55.

17
18
19
20
21
22
23
24
25
26
27

Quintana requested the court provide a jury instruction explaining "when there are two competing theories that the defendant gets the benefit of the doubt." AA XII 2631. Essentially, "when evidence is susceptible to two reasonable interpretations, one of which would point to the defendant's guilt and the other would admit of his innocence, then it is your duty in considering such evidence to adopt that interpretation which will admit a defendant's innocence and reject that which would point to his guilt." *Id.* at 2632-33. In support, Quintana argued "[w]e have two competing theories about what the recantation means, and the defendant should get the benefit of the doubt; right. It's not about which side you believe or which story you believe. It's about whether the State—and if you do have two theories that are equally plausible, the defendant should get the benefit of the

doubt. That's part of—that's part of judicial—that's part of due process, Judge. I'm not asking for something crazy or something that's out of the ordinary. I'm asking for an instruction that fits with the case." *Id.* at 2634. The State objected Quintana's request for this instruction. *Id.* at 2633. The court declined to give Quintana's proffered instruction. *Id.* at 2635.

Quintana's instruction is based upon language in *Bails v. State*, 92 Nev. 95, 96-97 (1976). In *Bails* this Court recognized the district court can give the instruction but noted "it is not error to refuse to give the instruction if the jury is properly instructed regarding reasonable doubt." *Id.* at 97. Admittedly, here, the district court provided the jury with a reasonable doubt instruction using the language in NRS 175.211(1). *See* AA III 795. Nevertheless, this Court should use Quintana's case as an opportunity to recognize where the evidence lends itself to two equally plausible conclusions, with one conclusion supporting a not guilty verdict, consonant with the presumption of innocence, defendants should be entitled to an instruction similar to the one Quintana requested at trial—even if the jury is otherwise properly instructed regarding reasonable doubt. Indeed, other jurisdictions require a similar instruction when wan-anted.

California has codified a similar instruction in California Pattern Jury Instruction 224 which has been approved for use in California criminal cases. *See People v. Anderson*, 152 Cal.App.4th 919, 931 (2007). Furthermore, the Indiana Supreme Court has noted that an instruction concerning the jury's obligation to reconcile conflicting evidence by adopting the interpretation which points to a defendant's innocence must be given in criminal cases. *See Robey v. State*, 454 N.E.2nd 1221, 1222 (Ind. 1983). Indiana later modified the *Robey* holding slightly, but still requires trial courts to instruct that the jury must "attempt to fit the evidence to the presumption that the Defendant is innocent." *See Simpson v. State*, 915 N.E.2d 511, 518 (Ind. Ct. App. 2010); *Smith v. State*, 981 N.E.2d 1262, 1268

43

(Ind. Ct. App. 2013). Additionally, Virginia allows defendants to instruct juries to the effect, "When facts are equally susceptible to more than one interpretation, one of which is consistent with the innocence of the accused, the trier of fact cannot arbitrarily adopt an inculpatory interpretation." *Case v. Commonwealth*, 753 S.E.2d 860, 864 (Va. Ct. App. 2014).

Quintana urges this Court to follow the above jurisdictions which require giving an instruction, like the one Quintana's proposed, upon request and in the appropriate circumstances. Although this Court has never expressly mandated courts must give an instruction similar to Quintana's proffered instruction, under these facts here the district court should have given Quintana's proposed instruction. Moreover, since *Bails* the legislature amended NRS 171.161(3) to mandate that district court provide instructions proposed by either party if the instruction accurately states the law. Quintana's proposed instruction accurately stated this Court's decision in *Bails*.

MG made serious allegations against Quintana. The State presented those allegations at trial. However, MG also recanted those allegations both before and during trial. Thus, the State had to prove MG's statements to police, others, and that her preliminary hearing testimony were accurate while her trial testimony was inaccurate and/or false. There was no other independent evidence to support MG's allegation save Quintana's false confession to the only two allegations the State knew about at the time Quintana interviewed with McCamey and Correa. The State was permitted to argue that jury should ignore MG's recantations and instead focus solely on her initial allegations as those allegations were more reasonable. Yet, it is just as reasonable that a troubled 11-year-old girl would falsely accuse her stepfather of molestation and that Quintana would falsely confess under police and familial pressure. Therefore, had the jury been instructed to reconcile these two interpretations by adopting the one which points to Quintana's innocence, which is

an accurate legal statement, the result of the trial would almost certainly have been different. Accordingly, Quintana respectfully requests this Court reverse his convictions.

**Claim Five: Cumulative error warrants reversal**

**Statement of Exhaustion:** This claim was raised and decided on direct appeal. PExs. 3, 6.

"Although individual errors may be harmless, the cumulative effect of multiple errors may violate a defendant's constitutional right to a fair trial." *Byford v. State*, 116 Nev. 215, 241-42, 994 P.2d 700, 717 (2000). "When evaluating a claim of cumulative error, [this Court] consider[s] the following factors: "(I) whether the issue of guilt is close, (2) the quantity and character of the error, and (3) the gravity of the crime charged." *Valdez*, 124 Nev. at 1195.

**A.      Issue of Guilt**

The issue of guilt in Quintana's case was close. The jury acquitted Quintana of seven (7) charges. This proves the jury was rightly concerned about MG's credibility and doubted her allegations against Quintana. Indeed, but for the various trial errors discussed *supra*, the jury almost certainly would have acquitted Quintana of the remaining charges.

**B.      Quantity and character of the evidence**

The numerous errors discussed herein directly impacted Quintana's due process right to a fair trial. In particular, the district court's refusal to allow Quintana to cross-examine MG regarding her allegations concerning AR directly and adversely impacted Quintana's fundamental, constitutional, right to confront his accuser. Additionally, the district court's decision to allow the State to present evidence concerning a domestic violence incident between Quintana and his wife Melissa, and then allow the State to argue to the jury that incident proves Quintana

45

is a violent person, violated long-standing precedent prohibiting the State from seeking conviction based upon unrelated and irrelevant conduct.

### C.    Gravity of charged crimes

Lewdness with a child under 14 carries a mandatory sentence of 10 years to life in prison and registration as a sex offender and lifetime supervision whenever the defendant is paroled. *See* NRS 201.230(2); NRS 176.0931; NRS 179D.441. Thus, without question, Lewdness with a child under 14 is a "grave offense."

Nevertheless, no matter how "grave" a crime is, a crime's gravity should never excuse the evisceration of a criminal defendant's substantial rights. Rather, with grave offenses courts should be hypervigilant in ensuring the defendant receives the fairest trial possible in accordance with longstanding notions of due process. Thus, if this Court is not inclined to reverse Quintana's convictions based upon any individual error as discussed herein, the Court should reverse his convictions based upon the cumulative effect of the errors.

## II.    Post-Conviction Claims

**Claim Six: Mr. Quintana's trial attorney provided ineffective assistance before and during trial and sentencing, violating Mr. Quintana's rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, as well as under Article 1, Section 8, of the Nevada Constitution**

**Statement of Exhaustion:** This claim was raised in post-conviction proceedings and is pending. PEx. 12.

On information and belief, Mr. Quintana's trial attorney provided ineffective assistance for the following reasons:

a.    The attorney failed to file and/or fully litigate meritorious pre-trial motions.

b.      The attorney failed to provide fully competent advice to Mr. Quintana regarding the State's plea offer, which, if accepted, would've made Mr. Quintana immediately eligible for parole.

c.      The attorney failed to fully object at trial to improper evidence.

d.      The attorney failed to fully cross-examine witnesses.

e.      The attorney failed to fully present exculpatory evidence and witnesses, including expert witnesses, during the defense's case-in-chief, including but not limited to evidence regarding Mr. Quintana's military service and mental health issues.

f.      The attorney failed to fully object to improper statements by the prosecutor during closing argument, including statements expressly found to be improper by the Nevada Supreme Court on direct appeal.

g.      The attorney failed to fully present mitigation evidence at sentencing.

h.      The attorney failed to object to improper arguments by the prosecutor at sentencing, including statements suggesting if Mr. Quintana received parole and was deported, he would nonetheless return to the United States despite being improperly documented, and statements that Mr. Quintana was likely to harm his grandchildren in the future.

**Claim Seven: Mr. Quintana's direct appeal attorney provided ineffective assistance, violating Mr. Quintana's rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, as well as under Article 1, Section 8, of the Nevada Constitution**

**Statement of Exhaustion:** This claim was raised in post-conviction proceedings and is pending. PEx. 12.

On information and belief, Mr. Quintana's direct appeal attorney provided ineffective assistance by failing to fully raise meritorious claims on direct appeal.

**Claim Eight: The prosecution withheld exculpatory information and/or knowingly failed to correct false testimony, violating Mr. Quintana's rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, as well as Article 1, Section 8, of the Nevada Constitution**

**Statement of Exhaustion:** This claim was raised in post-conviction proceedings and is pending. PEx. 12.

On information and belief, the prosecution withheld material exculpatory information and/or knowingly failed to correct false testimony.

## PRAYER FOR RELIEF

Accordingly, Nestor Quintana respectfully requests that this Court:

1.     Issue a writ of habeas corpus to have Nestor Quintana brought before the Court so that he may be discharged from his unconstitutional confinement;

2.     Conduct an evidentiary hearing at which proof may be offered concerning the allegations in this amended petition and any defenses that may be raised by respondents; and

3.     Grant such other and further relief as, in the interests of justice, may be appropriate.

Dated October 6, 2022.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Shelly Richter*

Shelly Richter
Assistant Federal Public Defender

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the United States of America and the State of Nevada that the facts alleged in this petition are true and correct to the best of counsel's knowledge, information, and belief.

Dated October 6, 2022.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Shelly Richter*

Shelly Richter
Assistant Federal Public Defender